# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

**JOSEPH NATHAN WILLS,**

     **Plaintiff,**

**vs.**                                                    **CIVIL ACTION NO. 1:15-13475**

**CAROLYN W. COLVIN**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

     **Defendant.**

## <u>PROPOSED FINDINGS AND RECOMMENDATION</u>

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433,1381-1383f. By Standing Order entered January 5, 2016 (Document No. 11.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings.[1] (Document Nos. 13 and 15.)

The Plaintiff, Joseph Nathan Wills (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on October 26, 2011 (protective filing date), alleging disability as of December 10, 2008, due to "bipolar, depression, muscles torn from bone in left shoulder, hernias,

---

[1] Claimant titled his pleading as his "Motion for Summary Judgment", however the undersigned treats same as his Motion for Judgment on the Pleadings in this Proposed Findings and Recommendation.

emphysema, COPD, carpal tunnel in both hands, and rheumatoid arthritis.[2] (Tr. at 306.) Claimant's applications were denied initially on February 22, 2012 (Tr. at 134-138, 139-143.) and upon reconsideration on November 26, 2012. (Tr. at 148-154, 155-161.) Claimant requested a hearing before an Administrative Law Judge (ALJ) which was held on December 3, 2013, before the Honorable Robert S. Habermann. (Tr. at 50-77.) The record was left open for the submission of additional evidence and for responses to interrogatories the ALJ intended to send for State agency consultant review from a psychological and orthopedic perspective. (Tr. at 76.) A supplemental hearing was held on April 2, 2014. (Tr. at 37-49.) By decision dated April 17, 2014, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 16-36.) The ALJ's decision became the final decision of the Commissioner on July 16, 2015 when the Appeals Council denied Claimant's request for review. (Tr. at 4-8.) On September 25, 2015, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)[3]

Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

---

[2] On his form Disability Report – Appeal, undated, Claimant asserted that since his last disability report dated March 20, 2012, his "[d]epression/anxiety worse" since October 2012. (Tr. at 336.)
[3] The Appeals Council permitted an extension of time to commence the civil action through September 25, 2015 by order dated November 6, 2015. (Tr. at 1-3.)

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental

impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

(c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work

activities. 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).[4] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

In this particular case, the ALJ determined that Claimant met the insured status requirements of the Social Security Act through December 31, 2012. (Tr. at 21, Finding No. 1.) Next, the ALJ found Claimant satisfied the first inquiry because he had not engaged in substantial

---

[4] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

gainful activity since the alleged onset date, December 10, 2008. (Id., Finding No. 2.) Under the

second inquiry, the ALJ found that Claimant suffered from the following severe impairments:

status post left shoulder rotator cuff repair; chronic obstructive pulmonary disease (COPD); bipolar

disorder; alcohol dependence in remission; and post-traumatic stress disorder (PTSD). (Tr. at 22,

Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet

or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.,

Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to

perform a range of light work as defined in the Regulations:

> He can occasionally lift and carry up to 50 pounds, sit for 2 hours at a time and a
> total of 6 hours in an 8-hour workday, stand for 2 hours at a time and a total of 6
> hours in an 8-hour workday, and walk for 2 hours at a time and a total of 6 hours in
> an 8-hour workday. He can occasionally reach overhead and push/pull with the
> upper extremities, but frequently reach in all other directions, handle, finger, and
> feel. He can frequently climb stairs and ramps, balance, stoop, kneel, crouch, and
> crawl, but occasionally climb ladders or scaffolds. He can have exposure to loud
> (heavy traffic) noise, occasional exposure to unprotected heights, and frequent
> exposure to moving mechanical parts, operating a motor vehicle, humidity and
> wetness, extreme cold, extreme heat, vibrations, dusts, odors, fumes, and
> pulmonary irritants. He is able to perform unskilled work. He can sustain simple
> work at an acceptable pace but not detailed or complex work. He is able to interact
> appropriately with others in the workplace on a superficial level. He is able to cope
> with normal work changes in a low-stress work environment and make independent
> decisions.

(Tr. at 24, Finding No. 5.) At step four, the ALJ found that Claimant was unable to perform past

relevant work. (Tr. at 31, Finding No. 6.) At step five of the analysis, the ALJ found Claimant was

thirty-four years old as of the alleged onset date, which is defined as a younger individual. (Id.,

Finding No. 7.) The ALJ found that Claimant had at least a high school education, and could

communicate in English. (Id., Finding No. 8.) Employing the Medical-Vocational Rules as a

framework, the ALJ determined that Claimant was not disabled, that transferability of job skills

was immaterial to the determination of disability, as Claimant's age, education, work experience,

and residual functional capacity indicated that there were other jobs existing in significant numbers in the national economy that Claimant could perform. (Id., Finding Nos. 9, 10.) On this basis, benefits were denied. (Tr. at 32, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on December 18, 1973, and was 40 years old when the ALJ issued his decision. (Tr. at 31.) Claimant attended school through the eleventh grade and later obtained a GED. (Tr. at 56.) He is married with two children. (Id.) He quit working when he injured his shoulder again trying to pick up several sheets of plywood. (Tr. at 58-59.)

Issues on Appeal

Claimant has alleged four main grounds in support of his appeal: (1) that the RFC fails to reflect his limitations as established by the medical evidence of record, specifically with regard to his left shoulder and his mental impairments (Document No. 14 at 12-15.); (2) the ALJ gave improper weight to opinion evidence that failed to take into account both Claimant's physical and psychological restrictions (Id. at 16-19.); (3) the ALJ did not apply the correct legal standard when evaluating Claimant's credibility regarding his limitations (Id. at 19-20.); and the ALJ's identification of other jobs he found Claimant could perform is not supported by substantial evidence. (Id. at 20.)

The Relevant Evidence of Record[5]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Evidence Concerning Mental Impairments:

On May 6, 2009, Claimant was seen at Princeton Community Hospital after he cut his left wrist in a suicide attempt. (Tr. at 410.) He stated that he had felt suicidal since his mother died. (Tr. at 417.) Claimant's fiancée told the hospital that he tore up the house and stated that she would fill out a petition to have him psychiatrically evaluated. (Tr. at 416.)

On May 8, 2009, Claimant was seen at Southern Highlands Community Mental Health Center (Southern Highlands) for an initial evaluation. (Tr. at 346.) He reported being divorced and living with his girlfriend and their four-year-old daughter. (Tr. at 347.) His grooming and hygiene were adequate, but he was irritable and not fully cooperative during the assessment. (Id.)

---

[5] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

Claimant's girlfriend initiated the evaluation after he cut one of his wrists with a knife. (Id.) He did not remember this event and reported drinking a pint of whiskey and blacking out. (Id.) Claimant reported that he did not have a drinking problem and instead stated that his anger and depression are the issues. (Id.) Claimant reported difficulty sleeping, being sad, having little interest in activities, and a decreased appetite. (Id.) He reported that his mental health issues began at the age of ten when he witnessed his father kill his mother. (Id.) He also reported that his depressive episodes in the past have been triggered by unemployment, he lost his construction job in December 2008 and was struggling financially. (Id.) Claimant noted that he spent a week in a psychiatric hospital in the 1990s after shooting himself in his shoulder. (Id.) He reported working most of his adult life as a paver and last working on a construction site as a "jack of all trades". (Id.) He left that job under unfavorable circumstances and felt he was treated unfairly. (Id.) On examination, Claimant's mood was depressed; his affect was anxious and irritable; he was oriented; he denied suicidal and homicidal thoughts; he reported that his memory was intact, but he had a poor self-concept and low confidence; his insight and judgment were fair; and his intellectual functioning appeared average. (Tr. at 348.)

On May 27, 2009, Claimant was seen again at Southern Highlands. (Tr. at 349.) He reported currently receiving unemployment and being stressed due to his unemployment, financial struggles, and his driving infractions, including a DUI and a driver's license revocation. (Id.) He stated that he drank beer daily and smoked marijuana, and that he did not want to quit drinking. (Id.) He spent his time fishing and working around the house and thought that he may be bipolar. (Id.) On examination, Claimant's appearance was clean, covered with tattoos, but "walked as though he was readying for a battle charge". (Tr. at 352.) He had normal psychomotor activity; his

mood was irritable; his affect was reactive and appropriate; his speech and thought content were normal; he denied suicidal or homicidal ideation; he was oriented; his attention and concentration were normal; he was fairly sociable with a fair support system; he displayed insight into his situation; his judgment was not impaired; and his intelligence was average. (Id.)

On June 24, 2009, Claimant was seen for a pharmacological management appointment and was depressed and anxious with appropriate speech. (Tr. at 353.) He denied suicidal or homicidal thoughts; his insight and judgment were fair; he was oriented; and his memory was good. (Id.) In July 2009, he was given a trial of Prozac, a prescription for Tegretol and was told to abstain from alcohol and drugs. (Tr. at 361.) In August 2009, he reported having a bad month and having trouble with the death of his uncle. (Tr. at 355.) He also noted that he was having problems with his memory and was often forgetting things. (Id.) The following month, Claimant was very upset during his appointment at Southern Highlands and it was attempted to admit him to the hospital, but he would not go. (Tr. at 357.) He stated that he was going to marry his girlfriend and was trying to get a construction job. (Id.) In December 2009, Claimant reported that he was not "too bad" and that the medication was pretty good, although he still had increased anger at times. (Tr. at 359.) He reported that he had an interview the following day for work. (Id.)

On April 12, 2012, he returned to Southern Highlands for an initial evaluation. (Tr. at 549-550.) Claimant reported that he wanted to restart treatment and explained that he quit services because he lost Medicaid and was not aware that treatment was offered to the uninsured. (Tr. at 550.) He rated his mood as fair and his depression as a five on a ten-point scale. (Id.) He reported undergoing frequent mood swings during a typical day and endorsed feelings of sadness, loss of motivation, persistent worry, a sense of failure, increased irritability, and decreased sleep, energy,

appetite, and concentration. (Id.) He noted that his depression began when he witnessed his father kill his mother when he was a child. (Id.) He stated that he quit drinking in 2009 when his wife filed a mental hygiene petition. (Id.) He felt stressed by occupation, economic, and marital issues. (Id.) On examination, Claimant was cooperative; his mood was depressed; his affect was constricted; he was oriented; his speech was spontaneous and relevant; his thoughts were logical; his recent memory was impaired; his insight and judgment were fair; and his intellectual functioning appeared average. (Tr. at 551.)

In May 2012, Claimant reported that everything was about the same: he was still having a lot of emotions; he was still having intermittent suicidal ideation; and he believed he was having side effects from the Cymbalta he was taking. (Tr. at 566.) His prescription for Cymbalta was discontinued; he started on a trial of Zoloft, and his Geodon and Valium dosages were increased. (Id.)

By June 2012, Claimant's anger issues were a little better; his depression had improved; and his suicidal thoughts had lessened. (Tr. at 565.) He was happy that his anger had improved, and he also noted that his sleep was better. (Id.) He was prescribed Zoloft and Valium, and his dosage of Geodon was decreased. (Id.) In July 2012, Claimant reported that he recently had a shingles outbreak, had increased anger the past few weeks, had lost his electricity, went to a wedding, and was fighting more with his wife. (Tr. at 563.) However, in late July 2012, he reported that he was sleeping better and his mood was improved. (Tr. at 562.) He stated that he getting out in the yard more and was being active. (Id.) He was prescribed Zoloft, Risperdal, and Valium. (Id.)

In August 2012, Claimant told his physician at Southern Highlands that he strained his neck overworking himself in his yard and was having a neck spasm. (Tr. at 561.) He reported his

mood was improved, but he was still getting irritable. (Id.) Claimant reported an intermittent suicidal ideation while shopping, but he interacted well during the appointment and was cooperative. (Id.) He was prescribed Zoloft, Risperdal, Valium, Flexeril, and Vistaril. (Id.)

On September 24, 2012, he stated that he had been doing well the past few weeks, but recently got sick, was feeling congested, and was dwelling on things. (Tr. at 560.) On examination, Claimant interacted well, was cooperative, made direct eye contact, and had an anxious mood with appropriate affect. (Id.) He was prescribed Zoloft, Risperdal, Valium, Flexeril, and Vistaril. (Id.)

On October 23, 2012, Claimant was seen at the Princeton Community Hospital emergency room because he was having suicidal thoughts. (Tr. at 583.) He reported running out of his medication three weeks prior and had not slept in three days. (Id.) He stated that he was showing signs of improvement with his medication (Risperdal and Zoloft), but he lost his medical card, could not afford the medication on his own, and his symptoms worsened. (Tr. at 589.) On examination, Claimant had a flat affect; was alert and oriented; displayed appropriate insight; made good eye contact; had normal speech and normal thought pattern; and did not appear to be having hallucinations. (Tr. at 584.) He was admitted to the hospital for safety and stabilization. (Tr. at 585, 591.) Medications were instituted and adjusted; Celexa was substituted for Zoloft and Haldol for Risperdal. (Tr. at 591.) Claimant was discharged on October 29, 2012, with the following medications: Remeron, Lisinopril, Celexa, Thorazine, and Augmentin. (Tr. at 598.)

In December 2012, Claimant still did not have Medicaid, so he sold his motorcycle to pay for his medication. (Tr. at 667.) He reported that the medication was very helpful and that he was sleeping better. (Id.) In January 2013, he reported feeling like he was going to have a nervous breakdown and stated that he may separate from his wife. (Tr. at 666.) He still did not have

Medicaid, and his mood swings had increased, he also reported difficulty controlling his emotions. (Id.)

On April 4, 2013, Claimant reported problems with his wife and endorsed feelings of helplessness and hopelessness. (Tr. at 663.) His wife asked him to leave the house again, and he noted that she was stressed over finances. (Id.) Claimant reported looking for odd jobs without success and noted that a relative had agreed to help him look for a job. (Id.)

On May 2, 2013, Claimant was given a re-assessment at Southern Highlands due to a change in his mood symptoms. (Tr. at 654.) He reported a decrease in his sleep and weight loss, but he was not experiencing any suicidal ideation. (Id.) His level of hostility and paranoia had also diminished from moderate to mild, as did his verbal aggression. (Id.) On examination, Claimant was alert and oriented; he appeared slightly disheveled and was easily distracted; he looked tired; he was pleasant and cooperative; his affect was dysphoric; and he complained of fatigue, anhedonia, frustration, and feelings of worthlessness. (Tr. at 655.) Claimant was diagnosed with Bipolar Disorder, Severe with Psychotic Features. (Tr. at 656.)

On June 10, 2013, Claimant saw PA-C Staci Craft at Southern Highlands and reported feeling very depressed. (Tr. at 646.) His wife asked him to leave, and he had been staying with his sister. (Id.) He reported that his depression had increased because he was unable to see his children. (Id.) His dosage of Paxil was increased, and he was continued on Vistaril and Valium. (Tr. at 647.) The record indicates that only one additional piece of evidence was submitted to the Appeals Council subsequent to the ALJ's decision: a handwritten note on a prescription pad dated October 31, 2014 from PA-C Craft that stated Claimant was currently under her care and that he was seeking disability due to his mental status. (Tr. at 10.) PA-C Craft further stated that Claimant was

being "monitored closely due to [increased] depression and frequent [suicidal ideation]". (Id.)

Evidence Concerning Physical Impairments:

On October 21, 2007, Claimant was seen at Princeton Community Hospital for right shoulder pain that began when he was hanging drywall. (Tr. at 364, 366, 369.) On examination, his shoulder was tender with limited range of motion. (Tr. at 369.) Claimant was given medication and a sling for his shoulder. (Tr. at 371.) He returned to the hospital one week later because the pain was getting worse (Tr. at 373.); Claimant was given medication and discharged. (Tr. at 381.)

In June 2008, Claimant fell ten feet from a ladder and hurt his left wrist, elbow, and shoulder. (Tr. at 387.) X-rays of his wrist, elbow, and shoulder were normal. (Tr. at 455-457.) He was given Toradol, Lortab, Flexeril, and a sling and was instructed to follow up with his orthopedic physician. (Tr. at 389.)

In November 2008, Claimant was seen at Princeton Community Hospital emergency room for painful urination and blood in his urine. (Tr. at 410.) He reported that he had been doing some heavy lifting the past two days. (Tr. at 406.) Claimant was prescribed Lortab and Flexeril and was instructed to follow up with a urologist. (Tr. at 407.)

At the end of January 2009, Claimant complained of bilateral shoulder pain with movement. (Tr. at 464, 501.) X-rays of his right and left shoulders were normal. (Tr. at 463-464). By March, Claimant was still having left shoulder pain with movement, but he denied weakness, redness, and neck pain. (Tr. at 502.) On examination, his left shoulder had decreased range of motion and pain with abduction and extension. (Id.) There was no redness, and his extremities showed no edema. (Id.) Hamza Rana, M.D., prescribed him Mobic and ordered an MRI. (Id.) In April 2009, an MRI of Claimant's left shoulder showed small, subacromial bursa effusion, which

was believed to be bursitis. (Tr. at 465.) The rotator cuff was normal, but there was a probable transverse tear of the superior and anterior labrum and mild degenerative hypertrophy of the acromioclavicular joint. (Id.)

In August 2009, Claimant saw Dr. Rana for low back pain, bilateral hand numbness, and left shoulder pain. (Tr. at 503.) On examination, Claimant had pain with movement of the left shoulder, and the Tinel sign was positive in his right hand. (Id.) Dr. Rana started Claimant on Anaprox for his low back pain and referred him to an orthopedist for evaluation of his low back pain, possible carpal tunnel syndrome, and left shoulder pain. (Id.)

On April 4, 2011, Claimant saw Heather Cook, PA-C, for evaluation of his bilateral shoulder pain. (Tr. at 504.) He stated that he worked in construction, and that his shoulders hurt when he starts to work. (Id.) Claimant was taking Motrin with some relief. (Id.) On examination, his overall findings were negative; the slap test was negative bilaterally. (Tr. at 506.) PA-C Cook referred him to orthopedics and prescribed him Ibuprofen and Ultram. (Id.)

On May 3, 2011, Claimant had an x-ray of his left shoulder, which showed no acute fracture or subluxation and no evidence of calcific tendinitis. (Tr. at 472.) The joint spaces appeared unchanged. (Id.) In June 2011, he saw PA-C Cook again for left shoulder pain (Tr. at 507.); on examination, he had limited range of motion in his left shoulder. (Tr. at 508.)

In August 2011, Claimant saw Philip J. Branson, M.D., for evaluation of his left shoulder pain and neck pain. (Tr. at 532.) Dr. Branson gave him an injection in the AC joint in his left shoulder. (Tr. at 533.) In September 2011, Claimant returned to Dr. Branson for a follow-up evaluation of his persistent left shoulder pain. (Tr. at 529.) He explained that he had a gunshot wound to his shoulder twenty years ago and had reconstructive surgery. (Id.) He then reinjured his

left shoulder in 2009, and the pain had been getting progressively worse since then. (Id.) Claimant also complained of neck pain with paresthesia in three fingers, but he denied decreased range of motion. (Id.) On examination, Claimant's left shoulder had full range of motion; the impingement sign was positive; he had fair to good strength in external rotation and thumbs down abduction; and he had pain over the AC joint and biceps tendon. (Tr. at 530.) Claimant had a positive Tinel's sign at the ulnar nerve of the elbow but no interosseous atrophy. (Id.) Dr. Branson diagnosed left shoulder AC joint arthritis and a labral tear. (Tr. at 531.) He recommended a left shoulder arthroscopy, AC joint resection, subacromial decompression and debride versus repair of the labrum. (Id.) On November 11, 2011, Dr. Branson performed the arthroscopy. (Tr. at 525.)

On November 22, 2011, Claimant was doing well and his pain was controlled, but he was having difficulty sleeping. (Tr. at 527.) His surgical incision was healing well without redness, drainage or signs of infection. (Tr. at 528.) Range of motion was restricted due to pain. (Id.)

In January 2012, Dr. Branson concluded that Claimant's left shoulder had stabilized at about 85 degrees abduction and forward flexion, but that he had made little forward progress and was still having a fair amount of pain. (Tr. at 559.) Dr. Branson recommended Motrin and Lorcet and continuation with aggressive physical therapy. (Id.)

In February 2012, Claimant told Dr. Branson that he was still taking his pain medicine two-to-three times per day. (Tr. at 558.) On examination, Claimant had good active motion in his left shoulder, a mildly positive impingement sign, and some weakness with resisted abduction. (Id.) Dr. Branson concluded that the overall strength and range in Claimant's shoulder was improving, and he recommended continued observation. (Id.) By April, Claimant had significant pain with initiation of abduction but satisfactory strength in resisted abduction. (Tr. at 557.) Dr. Branson

diagnosed Claimant with left shoulder pain and possible failed rotator cuff repair. (Id.) He injected his left shoulder with Lidocaine, Marcaine, and Celestone and instructed him to continue with physical therapy. (Id.)

On February 19, 2014, Claimant complained of bilateral hand pain and numbness, especially when he is out in cold weather. (Tr. at 787.) On examination, Claimant had mild swelling of his hands but no cyanosis of the fingers. (Tr. at 788.) Amy Profitt, FNP, diagnosed Claimant with bilateral carpal tunnel syndrome and prescribed him Ibuprofen and Hydrochlorothiazide. (Tr. at 789.)

Medical Opinion Evidence and RFC Assessments:

On January 23, 2012, Kelly Robinson, M.A., performed a consultative examination of Claimant. (Tr. at 535.) On examination, Claimant was alert and oriented; his mood was dysphoric; his affect was mildly restricted; his thought process appeared logical and coherent; there was no indication of delusions, obsessive thoughts, or compulsive behaviors; his insight was fair; and his judgment was within normal limits. (Tr. at 538.) He reported a history of three suicide attempts with the last one occurring in 2009; he denied current suicidal or homicidal ideation. (Id.) His memory was within normal limits; his concentration was within normal limits; and his psychomotor behavior was normal. (Id.) Ms. Robinson diagnosed Claimant with Mood Disorder, NOS based on his depressed mood, difficulty sleeping, diminished interest in activities, low self-esteem, and problems with concentration and fatigue. (Id.) She also diagnosed him with Post-Traumatic Stress Disorder, Chronic based on witnessing his father murder his mother when he was a child; Alcohol Dependence, in Remission; Cannabis Abuse, in Remission; and Cocaine Abuse, in Remission. (Tr. at 539.)

During Mr. Robinson's evaluation, Claimant also described his typical day as waking at 6:00 a.m., sitting around and watching television, trying to get outside to move around and get exercise, and trying to help with the housework. (Id.) Regarding daily activities, he reported that talks with his wife and children, takes his medication, showers, eats, heats food in the microwave, feeds the dog, and then goes to bed. (Id.) He also reported that he does not have a driver's license and, therefore, cannot leave his house, but that he goes to physical therapy three times per week and to church "once in a blue moon". (Id.)

On February 9, 2012, Andres L. Rago, M.D., performed a consultative examination of Claimant. (Tr. at 542.) On examination, Claimant ambulated without an assistive device and his gait was normal; he was stable at station, but prolonged sitting aggravated his left shoulder pain; he could heel and toe walk, but could not squat completely because of pain in his knees; and he had minimal difficulty getting onto and off of the examination table because of inability to use his left upper extremity. (Tr. at 544.) Claimant had moderate tenderness at his left shoulder with severe limitation of motion (Tr. at 545.); flexion was limited to 90 degrees and abduction to 80 degrees. (Tr. at 547.) His right shoulder was unremarkable. (Id.) He did not have difficulty doing fine manipulation with his right hand and fingers, but had difficulty using his left hand and fingers because of severe limitation of motion in his left shoulder joint and associated pain. (Id.) Dr. Rago concluded that the prognosis for Claimant's left shoulder was poor, but his mental health prognosis could improve with adequate treatment and follow-up. (Tr. at 546.) Dr. Rago further noted that Claimant gave good effort during his evaluation. (Tr. at 548.)

On January 3, 2014, Thomas Scott, M.D., a medical expert, provided responses to a Medical Interrogatory for Physical Impairments at the request of the ALJ following the first

hearing. (Tr. at 765.) Dr. Scott concluded that Claimant was limited in his use of his arms above shoulder level, especially on his left side (Id.) Dr. Scott opined that Claimant could continuously lift and carry up to twenty pounds and occasionally lift up to fifty pounds; could sit, stand, and walk for a total of two hours at one time; could sit and stand for a total of six hours in an eight-hour workday; could walk a total of five hours in an eight-hour workday; could occasionally reach overhead; could frequently reach in all other directions and frequently handle, finger, and feel; could occasionally push and pull; could frequently operate foot controls; could occasionally climb ladders and scaffolding and frequently perform all other postural maneuvers; could occasionally be exposed to unprotected heights; and could frequently be exposed to all other environmental limitations. (Tr. at 770-774.)

On January 3, 2014, Evelyn F. Adamo, Ph.D., a medical expert, completed the Medical Interrogatories for Mental Impairments at the request of the ALJ following the first hearing. (Tr. at 776-780.) She concluded that Claimant had moderate limitations in his activities of daily living, maintaining social function, and maintaining concentration, persistence, and pace; and had not experienced any episodes of decompensation within the last year. (Tr. at 777.) Dr. Adamo concluded that Claimant maintains the capacity to sustain simple work at an acceptable pace, but his depressive symptoms would preclude complex work. (Tr. at 780.) She noted that his reported hallucinations were infrequent, not threatening, and would not interfere with task persistence. (Id.) She opined that Claimant could interact appropriately with others in the work on a superficial level and could cope with normal work changes in a low stress work environment. (Id.) Dr. Adamo concluded that he could make independent decisions. (Id.) In her residual functional capacity assessment, Dr. Adamo opined that Claimant has marked limitations with complex instructions

and decisions, but only mild limitations dealing with simple instructions and decisions. (Tr. at 781.) She further opined that Claimant would have moderate limitations interacting appropriately with others, and to changes in a routine work setting. (Tr. at 782.) Dr. Adamo believed Claimant could manage benefits in his own best interest. (Tr. at 783.)

The Administrative Hearing

Claimant Testimony:

He testified that his past relevant work was in construction. (Tr. at 56, 60.) Claimant stated that he does not sleep very well due to pain and depression. (Tr. at 56-57.) Sometimes, Claimant's wife has to help him get dressed on his lower half of his body. (Tr. at 57.) Claimant testified that his wife prepares his meals, shops for food, and does the housework. (Id.) Claimant did no outside work, and that his brother-in-law takes care of it. (Id.) He stated that he spends his day watching TV, and sometimes read. (Tr. at 57-58.) He stated that he stays home most of the time, resting in his recliner, lay on the couch or goes back to bed. (Tr. at 58.)

He testified that he does not want to be in public, and has a fear of a crowd. (Tr. at 68.) He was able to go to places without feeling any anxiety or fear when he was being treated by Staci Craft and taking medication. (Id.) Without medication, Claimant testified that he is much worse, is easily aggravated; he has a short fuse. (Tr. at 68-69.) When struggling with depression, Claimant stated that he cannot focus on anything; he feels helpless and worthless, and does not have much interest in things. (Tr. at 69.) He has attempted suicide three times and sometimes still had suicidal thoughts. (Tr. at 64.) Claimant testified that he has crying spells several times per week, as well as panic attacks. (Id.) Depression and fear of not being able to take care of his family causes his panic attacks; his wife generally calms him down. (Tr. at 65.)

Claimant testified that he probably could not do any of his past relevant work today because his left shoulder does not have the same range of motion or strength it once had. (Tr. at 61.) He stated that he could not pick up anything with his left arm and that range of motion was limited in his shoulder. (Id.). The pain in his left shoulder travels to his elbow, neck, and back. (Id.) Claimant said that he takes Ibuprofen 800 for the pain. (Id.) He testified that his right arm has ligament damage as a result of compensating for his left shoulder. (Tr. at 62.) He stated he last saw Dr. Branson in 2012 and stopped seeing him because he lost his insurance. (Tr. at 65-66.) Claimant testified that his range of motion is about the same as it was when he stopped going to therapy, but picking up a gallon of milk hurts. (Tr. at 66.) He stated that he can only raise his left arm up to his chin but it hurts. (Tr. at 67.) Activity and sleeping on that side aggravates it, as well as wet and cold weather. (Id.)

He also reported having rheumatoid arthritis in his legs and feet, chronic obstructive pulmonary disease (COPD), neck pain, headaches, and depression. (Tr. at 63-64.) At the supplemental administrative hearing, Claimant testified that he had been diagnosed with neuropathy in his wrists and elbows. (Tr. at 40.) He was being treated with splints and medication, and was scheduled to see an orthopedic surgeon. (Tr. at 40-41.) He stated that the neuropathy caused him constant numbness in his fingers that prevented him from picking a penny up off the table. (Tr. at 41.) He testified that the splints do not help really and he had pain in his wrists, too; he had difficulty with buttons. (Tr. at 41-42.)

Vocational Expert ("VE") John Newman Testimony:

During the first hearing, the VE testified that Claimant's past relevant work was heavy and semiskilled, with no transferable skills to any level below heavy. (Tr. at 71.) The ALJ gave

the VE four hypotheticals, the first one concerning an individual that can lift and carry 10 pounds at least one-third of the day, can stand for six hours, can sit for six hours, with manipulative limitations, primarily with the left arm and hand, with no lifting overhead, or very little lifting overhead, with unlimited handling, fingering, and feeling, and avoiding fumes, odors, dusts, gases, but with "little" exposure to smoke, odors, dusts, gases, and limited to light unskilled work. (Tr. at 72.) The VE responded that the individual could perform work as an assembler, packer, laundry folder, inspector, tester, and sorter. (Tr. at 73.) The ALJ provided a second hypothetical that included the aforementioned limitations, but further restricted the individual would miss at least one day of work per week; the VE responded there would be no jobs. (Id.) For the third hypothetical, the ALJ added to the first hypothetical, only that the individual would have to rest at least one hour per day beyond his regular break and lunch; the VE responded there would be no jobs. (Tr. at 73-74.) The VE further testified that should the individual have to abandon tasks one day per week for either physical or emotional reasons, there would be no jobs. (Tr. at 74.)

In responding to questions from Claimant's representative, the VE stated that all the jobs he named required frequent reaching, which entailed extending hands and arms in any direction. (Tr. at 75.) The VE stated further that production-oriented jobs do not typically require overhead reaching. (Id.) In addition, the VE testified that should the individual be precluded from reaching of any kind, not just overhead reaching, on a sustained basis, that would severely reduce the occupational base, but allow for in-person service occupations with only occasional reaching. (Tr. at 75-76.)

<u>Vocational Expert (VE) Gerald K. Wells Testimony:</u>

The VE did not testify at the first hearing, but agreed with Mr. Newman's assessments (Tr. at 43-44.), however, given the additional limitations noted by Dr. Scott to only occasional reaching both overhead and in all directions, fingering, feeling, pushing, and pulling in both the right and left hand, the three jobs listed by Mr. Newman, assembler, packer, and inspector, would not remain. (Tr. at 46-47.) In addition, the VE stated that an individual with Claimant's work history, education, age and the aforementioned occasional manipulation restrictions, particularly with respect to Claimant's statement that he cannot pick up change, would eliminate all jobs. (Tr. at 47-48.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

First, Claimant argues that the ALJ's RFC assessment is not based on substantial evidence with respect to his physical and psychological restrictions: Dr. Branson's postoperative notes and the subsequent treatment notes indicated greater deficits in the range of motion in Claimant's left shoulder causing him constant pain than the "occasional" reaching the ALJ found Claimant capable of doing. (Document No. 14 at 12-14.) Further, the ALJ's finding Claimant capable of interacting with others on a "superficial" level fails to consider his extreme variations in his psychological limitations that were evident in the medical records. (<u>Id</u>. at 14-15.)

Second, Claimant contends the ALJ gave improper credit to the medical opinion evidence he solicited after the first hearing. (<u>Id</u>. at 16.) For starters, Dr. Scott's opinion did not reflect the objective medical evidence with respect to the greater restrictions to Claimant's left shoulder, particularly when Dr. Scott identified his right shoulder having been shot as opposed to his left. (<u>Id</u>. at 16-18.) Dr. Adamo's opinion did not reflect the medical evidence of record and was also inconsistent with her own moderate findings. (<u>Id</u>. at 18-19.) Third, Claimant states the ALJ's

credibility findings are not explained, and if anything, the examples he provided supported Claimant's allegations that exertions caused him pain, especially in his shoulder. (Id. at 19-20.) Finally, due to the ALJ's faulty RFC, the jobs identified that Claimant could perform are not an accurate reflection of his physical or psychological limitations. (Id. at 20.)

In response, the Commissioner argues that the ALJ's RFC is supported by substantial evidence with respect to Claimant's left shoulder impairment because "[h]e can occasionally reach overhead and push/pull with the upper extremities" is the most Claimant could do in accordance with the evidence of record; though he had less strength and limited range of motion in his left shoulder, there is no evidence suggesting that Claimant cannot use his left shoulder at all. (Document No. 15 at 14-17.) The Commissioner further argues that with respect to Claimant's mental limitations, the ALJ properly accounted for same by limiting him to simple, low-stress work, and superficial interactions with others as indicated by the evidence of record. (Id. at 17-18.)

Next, the Commissioner contends that the ALJ's evaluation of Dr. Scott's opinion is supported by substantial evidence; the ALJ noted that he was a non-examiner, but was provided all the available medical records, and the ALJ provided a well-reasoned analysis for the great weight he gave to Dr. Scott's opinion. (Id. at 18-19.) Regarding the ALJ's analysis of Dr. Adamo's opinion, the Commissioner also states that her conclusions were supported by specific citations in the evidence, and the ALJ's reliance on her findings was proper. (Id. at 19.)

Finally, the Commissioner states that the ALJ's analysis for his credibility determination is also supported by substantial evidence because he noted several instances in the evidence of record that undermined Claimant's allegations of disabling impairments and symptoms. (Id. at 20.)

Analysis

  The RFC Assessment:

  Residual functional capacity represents the *most* that an individual can do despite his

limitations or restrictions. See Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis

in original). The Regulations provide that an ALJ must consider all relevant evidence as well as

consider a claimant's ability to meet the physical, mental, sensory and other demands of any job;

this assessment is used for the basis for determining the particular types of work a claimant may

be able to do despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC

determination is an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(d), 416.927(d).

> In determining what a claimant can do despite his limitations, the SSA must consider
> the entire record, including all relevant medical and nonmedical evidence, such as a
> claimant's own statement of what he or she is able or unable to do. That is, the SSA
> need not accept only physician's opinions. In fact, if conflicting medical evidence is
> present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

  In this case, with respect to his left shoulder impairment, the ALJ considered the following

evidence of record[6]: Claimant's allegations in his initial application for disability; his testimony

during the first hearing[7]; emergency room records stemming from Claimant's June 2008 fall from

a ladder and resulting x-ray images that indicated normal findings; a normal January 2009 imaging;

outpatient treatment notes from Bluestone Health Center noting decreased range of motion and

---

[6] For the sake of brevity, the undersigned focused on the general evidence referenced by the ALJ in his lengthy discussion of same.

[7] Specifically, the ALJ noted Claimant testified that he "is 'probably not' able to do his past work" because his left shoulder has limited movement and decreased strength and he has continuous pain "which goes to his elbow as well as his neck and back, and that his left hand goes numb a lot." (Tr. at 24.) The ALJ further noted that Claimant testified that physical therapy helped "a little" but discontinued due to lack of money though his range of motion is about the same as it was during therapy. (Tr. at 25.) From the supplemental hearing, the ALJ considered Claimant's testimony that he was recently diagnosed with neuropathy, and used splits and medications, though he was unable to make a good fist and could not pick up change off a table and also had difficulty with buttons. (Id.)

increased pain with abduction and extension; emergency department records from Princeton Community Hospital, which included a March 2009 MRI; medications prescribed for his pain; August 2009 records noting Claimant's continued complaints of pain, particularly with movement; April 2011 treatment notes reporting Claimant's continued pain, but working in construction, with overall negative findings on physical examination as well as from additional imaging; treatment records from Dr. Branson; outpatient records from Princeton Community Hospital regarding Claimant's left shoulder arthroscopy, subacromial decompression, arthroscopic resection of the AC joint, labral repair, and debridement of partial thickness rotator cuff tear; post-surgical physical therapy records from the Orthopedics of the Virginias; as well as the consultative examination with Dr. Rago. (Tr. at 24-27.)

With regard to his mental impairments, the ALJ considered the following evidence of record: Claimant's initial applications for benefits, listing bipolar disorder, depression, and anxiety as disabling mental impairments; Claimant's testimony of having crying spells, a desire not to be in public, fear of crowds, grouchiness, having a short fuse, inability to focus, and feelings of helplessness and worthlessness; numerous treatment records from Southern Highlands, including the two year gap in mental health treatment; the May 2009 emergency room visit when Claimant attempted suicide by lacerating his left wrist while intoxicated; the psychological consultative examination with Kelly Robinson, M.A.; Claimant's reports of suicide attempts, drug and alcohol abuse; his October 2012 hospitalization for six days at Princeton Community Hospital with subsequent mental health treatment which, by August 2013, it was noted Claimant exhibited stable mood and appropriate affect. (Tr. at 24, 25, 28, 29.)

After consideration of the aforementioned evidence, the ALJ performed the proper two-step[8] credibility determination wherein the ALJ found Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms, however, his statements regarding the intensity, persistence and limiting effects were deemed not entirely credible. (Tr. at 29.) With regard to his left shoulder impairment, the ALJ noted that treatment notes reported Claimant engaged in activities including loading scrap metal, working in the yard, and doing odd jobs, which the ALJ deemed indicative of greater activity level than Claimant alleged he was capable. (Id.) With regard to mental impairments, the ALJ noted Claimant had "more than a 2-year period" of no treatment, and further, the impartial medical expert opined he had no disabling mental limitations. (Id.) Additionally, the ALJ referenced the findings of State agency medical and psychological experts, namely, Dr. Scott and Dr. Adamo, respectively, neither of whom endorsed a finding that Claimant's physical or mental impairments were disabling. (Tr. at 30.)

With respect to the State agency medical consultants, the ALJ noted their opinions finding Claimant capable of "a range of light work with postural limitations" specifically with his left shoulder. (Id.) The ALJ further noted that Dr. Scott opined Claimant capable of lifting up to 50 pounds occasionally and 20 pounds continually, sitting and standing a total of 6 hours and walking for a total of 5 hours; the ALJ noted none of these experts examined Claimant, but valued their opinions for their review of all the medical records, particularly Dr. Scott's opinion, who was provided more evidence for his review. (Id.) The ALJ found Dr. Adamo's opinion "consistent with the medical evidence of record as a whole" and incorporated her limitation to simple work and her finding Claimant capable of interacting appropriately with others in the workplace on a superficial

---

[8] Pursuant to Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).

basis, however, the ALJ further restricted Claimant to "no detailed instructions" "as the medical evidence of record supports" such a limitation. (Id.)

Lastly, the ALJ found that based on the entire record, which included Claimant's testimony, the severe impairments did not preclude him from "many basic activities associated with work." (Id.) The ALJ found the RFC supported by the objective medical evidence of record, that treatment notes did not support Claimant's allegations of disabling impairments, and further, that Claimant's credibility was "weakened" by inconsistent statements and by the objective medical evidence. (Id.) Nevertheless, the ALJ noted Claimant "experienced some levels of pain and limitations but only to the extent described in the [RFC]." (Tr. at 30-31.)

From the aforementioned, the undersigned finds that the ALJ's RFC assessment, from both standpoints of his physical and mental limitations, was crafted in accordance with the Regulations, that the conflicting evidence was properly reconciled by the ALJ per his duty under the Regulations, and finally, is supported by substantial evidence.

The Evaluation of Opinion Evidence:

20 C.F.R. §§ 404.1527 and 416.927 govern the SSA's criteria for evaluating opinion evidence; per §§ 404.1527(a)(2), 416.927(a)(2):

> Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a

whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994). The Regulations provide that an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors.

Claimant has argued that with respect to his left arm impairment, with its limited range of motion, weakness, and continuous pain, all of this evidence is well supported by the medical records, but is not reflected in Dr. Scott's opinion, which the ALJ expressly gave more weight than the opinions provided by the other State agency medical consultants. (Document No. 14 at 16, Tr. at 30.) In support of his argument, Claimant refers to Dr. Scott's notation of the gunshot to Claimant's right shoulder, though this wound was actually in Claimant's left shoulder. (Document No. 14 at 17.) Moreover, Claimant states that Dr. Scott's opinion is contradicted by Dr. Branson's records[9], the office notes from Bluestone Health Center, as well as Dr. Rago's consultative examination findings, all of which showed that Claimant had significant limitation in range of motion and ongoing pain to his left shoulder. (Document No. 14 at 17-18.)

On January 3, 2014, Dr. Scott[10] responded to interrogatories forwarded from the ALJ; Dr. Scott confirmed that he "reviewed the evidence we furnished to you" in response to interrogatory number 2. (Tr. at 765.) Claimant directs the Court's attention to interrogatory number 6, which states:

---

[9] The undersigned notes from the record that Dr. Branson did not provide a medical opinion on Claimant's left shoulder impairment as defined by the Regulations, supra.
[10] It is noted from the record that Dr. Scott's medical specialty is orthopedics. (Tr. at 774.)

29

Please specify the claimant's impairments, if any, established by the evidence. Note that regardless of how many symptoms an individual alleges, or how genuine the complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings per 20 CFR §§ 404.1508 and/or 416.908. Cite the objective medical findings that support your opinion, with specific references (exhibit or page number) to the evidence we provided from the case record.

(Id.) In response, Dr. Scott succinctly stated Claimant's "Limitation of use of arms above shoulder level especially on [left] rotator cuff decompression in Nov 2011 [left] shoulder". (Id.) Dr. Scott further opined in response to interrogatory number 7 that Claimant's impairments did not meet or equal those described in the Listing of Impairments, and noted "See RFC's [l]imited use of arms above shoulder level especially on left." (Tr. at 766.) Lastly, in response to interrogatory number 9, which requests "please identify any functional limitations or restrictions that result from the impairment(s) listed in [interrogatory] number 6[]", Dr. Scott wrote "See previous pages should be capable of medium work activity". (Tr. at 767.) What appears to be additional handwritten notes, and pertinent to this discussion, Dr. Scott ostensibly wrote: "[left] cuff-repair Nov '11" and "[right] shoulder gunshot 1990".[11] (Tr. at 768.)

Dr. Scott also completed a Medical Source Statement of Ability to do Work-Related Activities (Physical), giving the specific overhead and all other reaching, handling, fingering, feeling, and push/pull findings noted *supra*; in response to the query to supply the "particular medical or clinical findings which supported" this assessment, Dr. Scott wrote: "Gunshot to [right] shoulder 1991" and "Rotator cuff repair 2011". (Tr. at 771.) Finally, Dr. Scott opined Claimant

---

[11] The undersigned notes there are no headings or interrogatories printed on this page; the additional writings appear to state "Wills April '12" and "13 May '13" with no further references or description.

30

would have "[d]ifficulty working above shoulder level" and that this limitation had been present since "Nov 2011". (Tr. at 774.)

The existence of left shoulder pain and its attendant limitation in range of motion is not a contested feature in this disability claim. Indeed, the ALJ has provided numerous references to the medical evidence in his written decision that mention Claimant's left shoulder pain, a condition that has been continuous, for the most part, since June 2008. (Tr. at 25.) As mentioned *supra*, Dr. Scott affirmed that he received all the evidence of record necessary for him to provide a medical opinion based on his specialty (Tr. at 76, 742.); these are the same[12] records that the ALJ cited throughout his decision:

For starters, the undersigned notes that the ALJ referenced "an orthopedic visit in August 2011" when Claimant "reported a previous gunshot wound to the right shoulder 20 years prior and reconstruction surgery, though he later reported that the gunshot wound was to his left shoulder (Ex. 5F at 6; Ex. 7F at 1.)"[13] (Tr. at 26.) The ALJ noted that at an orthopedic treatment visit to Dr. Branson in November 2011, Claimant "reported that he was overall doing well and his pain was controlled" and he "had restricted range of motion due to pain". (Tr. at 27, 527, 528.) The next month, Dr. Branson reported that Claimant "had made satisfactory post-operative progress" and "continued in physical therapy". (Tr. at 27, 571.) In January 2012, the ALJ took note that at his physical therapy visit, Claimant reported "a little more soreness in his shoulder from loading some scrap metal in his truck." (Tr. at 27, 712.) Later that same month at a visit to Dr. Branson, the ALJ

---

[12] The notable exception would have been Exhibit 20F, which included a February 2014 treatment visit at Bluestone Health Center regarding Claimant's complaints of bilateral hand pain and numbness; the records were submitted on April 1, 2014 and included dates of service from May 10, 2013 through February 19, 2014. (Tr. at 784-793.)

[13] These Exhibits reference office treatment records from Dr. Branson (Tr. at 532.) and the consultative report from Dr. Rago, respectively. (Tr. at 542.)

31

noted that it was reported Claimant "had good active initiation of abduction but deficient abduction and forward flexion."[14] (Tr. at 27, 559.) Next, the ALJ cited "a note on the same date" in which the physical therapist wrote "that the claimant recently complained of increased pain and soreness after moving his motorcycle in his garage and reaching out to catch his son from falling about 3 weeks earlier. She noted that he had felt a painful pop while doing an exercise." (Tr. at 27, 699.)

The ALJ also discussed Dr. Rago's findings, one of which was that Claimant had moderate tenderness at the left shoulder "with severe limitation of motion . . . and he had difficulty using the left hand and fingers." (Tr. at 27, 545.) Other joints in the upper extremities were unremarkable and Claimant exhibited "no motor or sensory deficit and no muscle weakness or atrophy." (Id.) Next, the ALJ noted "[a]t a physical therapy visit later that month[15], the claimant reported increased pain the previous week from carrying his kerosene heater." (Tr. at 27, 676.)

The following day, he complained of pain to his orthopedic surgeon, but it was noted that Claimant's "overall range and strength appeared to be gradually improving." (Tr. at 27, 558.) It was further noted that at an orthopedic visit in April 2012, Claimant continued to complain of pain in his left shoulder, for which he received an injection. (Tr. at 27, 557.) The ALJ continued to cite references in the medical record that Claimant complained of left shoulder pain to his primary care provider at Bluestone Health Center in April and June 2012 (Tr. at 27, 619, 624.), although a review of his musculoskeletal findings were overall normal. (Tr. at 27, 622, 626.)

The ALJ noted that during a mental health treatment visit in late July 2012, Claimant "reported getting out in the yard and being active", and in August 2012, reported "he had been

---

[14] Dr. Branson assessed Claimant as "markedly behind in motion" and recommended that he continue with "aggressive physical therapy" and speculated that Claimant "may have ruptured the debrided rotator cuff." (Tr. at 559.)
[15] The record indicates that this physical therapy note is dated February 27, 2012.

working in the yard." (Tr. at 27, 562, 561.) Claimant reported having left shoulder pain during various medical appointments in September 2012, in February 2013, and in May 2013, though earlier in May 2013 during a mental health treatment visit, the ALJ noted that Claimant "reported trying to do odd jobs and helping his wife around the house." (Tr. at 27-28, 605, 609, 614, 617, 656.)

Ultimately, the ALJ acknowledged Claimant's allegations of disability due to his left shoulder issues, and further acknowledged that "the medical evidence of record shows some left shoulder limitations, though they would not preclude substantial gainful employment." (Tr. at 29.) The ALJ noted Claimant's reported activities within the treatment records, *supra*, that included "loading scrap metal", "working in the yard", and "doing odd jobs", which the ALJ found, "indicate greater activities than he described." (Id.) The ALJ further considered the opinion evidence of record, noting the State agency medical consultants opined that Claimant could perform "a range of light work, with postural limitations, limitations regarding the left upper extremity, and environmental limitations, including regarding pulmonary irritants." (Tr. at 30.) Dr. Scott and the other State agency medical consultants were found to be "acceptable medical sources" under the Regulations, despite the fact that none of them examined or treated Claimant. (Id.) However, the ALJ noted that "they each had the opportunity to review all available medical records when forming their opinions and opined that the claimant could perform a range of light work." (Id.) The primary reason the ALJ afforded Dr. Scott's opinion more weight because he had the opportunity to review more evidence than the others, which was submitted after they rendered their opinions. (Id.)

From all the aforementioned, the ALJ's evaluation of Dr. Scott's opinion does not appear to deviate from the provisions set forth in the Regulations. Given the factors provided under 20 C.F.R. §§ 404.1527 and 416.927(c)(2)-(6): the ALJ discussed the non-examining nature of Dr. Scott's opinion; though not referenced in the written decision, the ALJ specifically requested Dr. Scott's orthopedic opinion due to the nature of Claimant's impairments (Tr. at 76.); the ALJ noted that Dr. Scott reviewed more medical records in order to form an opinion than any other specialist; though brief, Dr. Scott referenced the primary impairment to Claimant's left shoulder, and further opined that the deficit had been present since November 2011, when Claimant underwent surgery by Dr. Branson; and the ALJ noted that Dr. Scott and the other State agency medical consultants found Claimant capable of a range of light work.[16]

With regard to Claimant's contention that the opinion evidence solicited from Evelyn Adamo, Ph.D. was also unsupported by the mental health records or provided citations to the record in support of her opinion (Document No. 14 at 18.), the undersigned finds that she did so: On January 3, 2014, Dr. Adamo[17] responded to interrogatories forwarded from the ALJ; she also confirmed that she "reviewed the evidence we furnished to you" in response to interrogatory number 2. (Tr. at 776.) Interrogatory number 7 provides:

> Please specify the claimant's impairments, if any, established by the evidence. Note that regardless of how many symptoms an individual alleges, or how genuine the complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings per 20 CFR §§ 404.1508 and/or 416.908. Cite the objective medical findings that support your opinion, with specific references (exhibit or page number) to the evidence we provided from the case record.

---

[16] This consistency in the opinion evidence is notable; the undersigned further notes there were no medical opinions in the record that indicated Claimant was disabled, from a physical or orthopedic standpoint.

[17] It is noted from the record that Dr. Adamo's medical specialty is clinical psychologist. (Tr. at 783.)

(Id.) Dr. Adamo responded: "Bipolar Disorder, Cannabis Abuse, Alcohol Dependence in full sustained remission 12F, 14F".[18] (Id.) Interrogatory number 10 states: "As you have concluded that the claimant's impairment(s) did not "meet" or "equal" a listing, identify what the claimant can still do in a work setting on a sustained basis despite his/her mental impairment(s). Please cite the specific evidence supporting your opinion." (Tr. at 780.) In response, Dr. Adamo wrote the following:

> He is able to understand and remember detailed instructions.
> He retains the capacity to sustain simple work at an acceptable pace. Depressive symptoms would preclude complex work. Reported hallucinations are infrequent, not threatening, and would not interfere with task persistence.
> No suicidal ideation on 5/13 (14F)
> He is able to interact appropriately with others in the work place on a superficial level.
> He is able to cope with normal work changes in a low stress work environment. He is able to make independent decisions.

(Id.)

Though brief, Dr. Adamo did reference two Exhibits in the record she ostensibly found supportive of her opinion.

In regard to the Medical Source Statement of Ability to do Work-Related Activities (Mental), Dr. Adamo opined that Claimant had no restrictions in his ability to understand an remember simple instructions; mild restrictions in his ability to carry out simple instructions or ability to make judgments on simple work-related decision; and marked restrictions in his ability to understand and remember complex instructions, in his ability to carry out complex instructions, and in his ability to make judgments on complex work-related decisions. (Tr. at 781.) She

---

[18] These Exhibits are the inpatient hospital records from Princeton Community Hospital when Claimant was hospitalized in October 2012 (Tr. at 582-600.) and the office treatment records from Southern Highlands, dated September 24, 2012 through August 30, 3013 (Tr. at 640-670), respectively.

identified "depressive symptoms, low energy preclude complex work". (<u>Id.</u>) She also opined Claimant had moderate restrictions in his ability to interact appropriately with the public, with supervisors, with co-workers as well as in his ability to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. at 782.) In support of the moderate restrictions she found, she wrote "[a]ppropriate interpersonal interaction at CE (6F) Pain preoccupations and dejected mood cause instability and avoidance. Capable of brief, superficial interactions only". (<u>Id.</u>) Dr. Adamo found no other capabilities affected by Claimant's mental impairment. (<u>Id.</u>) She further found that Claimant's limitations as noted *supra* were present on his alleged onset date. (<u>Id.</u>) In response to the query "what changes you would make to your answers if the claimant was totally abstinent from alcohol and/or substance use/abuse" Dr. Adamo wrote: "History of alcohol dependence, now in remission. He abuses cannabis. Absent cannabis abuse, motivation and energy would improve. No change in assessment absent cannabis abuse because chronic bipolar symptoms would persist." (<u>Id.</u>)

In his review of Claimant's mental health treatment, the ALJ noted a suicide attempt in May 2009 resulting in an emergency room visit for treatment after he lacerated his left wrist while intoxicated. (Tr. at 28, 410.) The ALJ noted Claimant's continued treatment for his depressed mood and anxiety at Southern Highlands following the May 2009 incident, when he reported that his "depressive episodes in the past had always been triggered by unemployment". (Tr. at 28, 347-348.) It was further noted by the ALJ that Claimant received treatment at Southern Highlands "thereafter in 2009 and for one visit in early January 2010, including taking prescribed

psychotropic medications", and then had a "substantial gap in mental health treatment of more than two years."[19] (Tr. at 28.)

The ALJ discussed the psychological consultative examination provided by DDS examiner Kelly Robinson, M.A. in January 2012.[20] (Id.) Referencing Ms. Robinson's findings, Claimant was alert, oriented to four spheres, with dysphoric mood, mildly restricted affect, logical and coherent thought processes, normal memory and concentration, normal social functioning, and normal persistence and pace; "[d]iagnoses included mood disorder, not otherwise specified, PTSD, and alcohol dependence in remission." (Tr. at 28, 537-359.) The ALJ noted that Claimant returned to Southern Highlands for treatment in April 2012, "[d]iagnoses of bipolar disorder, not otherwise specified and PTSD were noted" for which he was prescribed medication. (Tr. at 28-29, 550, 552, 560-566.) The ALJ also acknowledged that Claimant reported that he had intermittent auditory hallucinations since his early 20s. (Tr. at 28, 551.) The ALJ further noted that by October 23, 2012, Claimant reported that he was without his medication (Tr. at 669.), as a result of losing his medical card, and he "could not afford anything" (Tr. at 589.); he reported having suicidal ideation, was admitted for treatment, and a urine drug screen was positive for marijuana. (Tr. at 29, 587, 669.) It was further reported that Claimant was "withdrawn, but pleasant, relating and engaging well and with good attention and concentration." (Tr. at 29, 591.) At discharge, the ALJ noted Claimant's GAF score was 55.[21] (Tr. at 29, 599.) The ALJ acknowledged that the records indicated that

---

[19] The undersigned notes that Claimant takes issue with the ALJ's notation regarding the gap in services, suggesting that it was not as long as stated (Document No. 14 at 14.), and references the April 12, 2012 intake report from Southern Highlands that indicated "he quit services last February after he lost Medicaid and wasn't aware that treatment was offered to the uninsured." (Tr. at 550.) Nevertheless, the evidence of record contains no mental health treatment notes from Southern Highlands between the dates of January 5, 2010 and April 12, 2012, or from any other mental health treatment facility within that time frame.
[20] This psychological evaluation is designated as Exhibit 6F in the record.
[21] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has "moderate symptoms (e.g. flat affect and circumstantial

Claimant continued with his treatment at Southern Highlands, with "his last visit in the record occurring in late August 2013, at which he exhibited stable mood and appropriate affect." (Tr. at 29.)

Ultimately, the ALJ found that Claimant's mental limitations were not disabling, based on his lack of treatment over a two-plus year period after the alleged onset date, as well as on the opinion of an impartial medical expert. (Id.) Regarding the opinion evidence which included the State agency medical consultants and the impartial medical experts, the ALJ "accorded significant weight to their opinions", but gave "little weight" to the State agency psychological consultants who opined Claimant's mental impairments were non-severe, and instead noted that the medical evidence, including the opinion provided by Dr. Adamo, indicated Claimant had at least moderate limitations. (Tr. at 30.) The ALJ found Dr. Adamo "likewise an acceptable medical source" and that she "reviewed all available medical records when forming her opinion, and her opinion is consistent with the medical evidence of record as a whole." (Id.) The ALJ mentioned that Claimant's representative believed Dr. Adamo made a "mistype" when she opined that Claimant could understand and remember detailed instructions, and explicitly stated that the medical

---

speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994). Claimant also points out that his GAF scores have fluctuated from as high as 60 on May 27, 2009 (Tr. at 361.) to as low as 35 on October 23, 2012 (Tr. at 599.) and contends that psychologically, he does relatively well for a period, and at times "struggles significantly." (Document No. 14 at 15.) A GAF of 31-40 indicates that the person has "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

evidence supported "limitation to no detailed instructions" and incorporated same in his RFC assessment. (Id.)

From the evidence the ALJ reviewed with respect to Claimant's mental impairments, the ALJ's evaluation of Dr. Adamo's opinion also does not appear to deviate from the provisions set forth in the Regulations. Again, with respect to the factors provided under 20 C.F.R. §§ 404.1527 and 416.927(c)(2)-(6): though not referenced in the written decision, the ALJ specifically requested Dr. Adamo's psychological opinion due to the nature of Claimant's impairments (Tr. at 76.); the ALJ noted that Dr. Adamo reviewed "all available medical records" when forming her opinion; and expressly noted that her opinion was consistent with the medical record, particularly with respect to her finding Claimant had moderate limitations as opposed to none by her State agency psychological consultant peers. Most importantly, the ALJ agreed with Dr. Adamo's opinion that Claimant was capable of simple work as described in her mental RFC assessment, *supra*. Once again, there was no contrary medical opinion in the record that Claimant was disabled from a psychological standpoint.

Under the circumstances relating to Claimant's physical and mental impairments, and the opinions regarding same, in order to reassess or reevaluate Dr. Scott's opinion or Dr. Adamo's opinion, the Court would have to reweigh the evidence or substitute its judgment for the ALJ's, an undertaking beyond the scope of this judicial review. See, Johnson v. Barnhart, 434 F.3d 650, 652 (4th Cir. 2005) (internal citations omitted). Further, the ALJ provided "an accurate and logical bridge from the evidence to his conclusion" thus giving ample explanation in support of his conclusion to allow for meaningful judicial review. Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000); Radford v. Colvin, 734 F.3d

288, 295 (4th Cir. 2013). Finally, due to the overall evidence of record, including the opinion evidence provided, the ALJ's ultimate finding that Claimant's physical and mental impairments were not disabling was based upon substantial evidence. 20 C.F.R. §§ 404.1521(a), 416.921(a); Owens v. Barnhart, 400 F.Supp.2d 885, 891 (W.D. Va. 2005). Accordingly, the undersigned finds that Claimant's argument that the ALJ improperly evaluated the opinion evidence provided by Drs. Scott and Adamo lacks merit.

     The Credibility Determination:

     Pursuant to Craig v. Chater, 76 F.3d 585 (4th Cir. 1996) an ALJ must first make a threshold determination that the claimant had demonstrated by objective medical evidence that he suffers from a medically determinable impairment which could reasonably be expected to cause the alleged symptoms; next, only after a claimant has met his threshold obligation, then the intensity and persistence of the claimant's pain and the extent to which it impacts the ability to work must be evaluated. Id. at 594-595. Social Security Ruling (SSR) 96-7p[22] clarifies when evaluating symptoms, including pain, 20 C.F.R. §§ 404.1529, 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; the Ruling also explains the factors to be considered in assessing the credibility of the individual's statements about symptoms, as well as the importance of explaining the reasons for the finding about the credibility of the individual's statements. 1996 WL 374186, at *1.

     The undersigned finds that the ALJ expressly stated the two-step process required to assess Claimant's symptoms with the objective medical evidence, and his statements regarding the intensity, persistence and functional limitations of his symptoms prior to finding him not fully

---

[22] The undersigned is mindful that this Ruling has been superseded by SSR 16-3p, however, the previous Ruling was in effect at the time of the ALJ's decision, April 17, 2014.

credible. (Tr. at 24, 29.) SSR 96-7p directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work. Id. *passim*.

In this case, after providing the requirements of Sections 404.1529 and 416.929, SSRs 96-4p and 96-7p, the ALJ started with a lengthy discussion summarizing Claimant's statements in his applications for benefits; his testimony at the first hearing that included his left shoulder issues, the physical therapy he endured after surgery, as well as his financial reasons for stopping therapy, his right shoulder ligament damage due to overcompensation for his left shoulder, his COPD and short-windedness, his smoking habit, pains in his neck and headaches, his rheumatoid arthritis in his legs and feet, his suicidal ideation and three suicide attempts, his frequent crying spells, desire not to be in public, fear of crowds, grouchiness, having a short fuse, inability to focus, feelings of helplessness and worthlessness; his testimony at the supplemental hearing that centered on his neuropathy and manipulation problems as a result. (Tr. at 24-25.) The ALJ then discussed Claimant's complaints of pain, particularly in his left shoulder, and the medical evidence of record pertaining to his physical impairments as well as his mental impairments, the more salient aspects

41

reproduced *supra*. (Tr. at 25-28.) The ALJ discussed the medications Claimant was prescribed for his mental diagnoses, and his suicidal ideation and hospitalization when he discontinued taking his medications, due to financial issues. (Tr. at 28, 29.) The ALJ discussed his left shoulder surgery, and subsequent treatment with physical therapy (Tr. at 26.) which Claimant stated helped "a little", but quit due to money problems (Tr. at 25.), and the injection he received when his pain persisted. (Tr. at 27.)

Regarding his COPD complaints, the ALJ discussed the findings of Dr. Rago, who noted he "had good breath sounds bilaterally and no respiratory wheezes." (Id.) The ALJ found there was "very little pulmonary treatment and he continues to smoke." (Tr. at 29.) Regarding his neuropathy, with his complaints of numbness and pain in his hands, particularly in cold weather, including his fine motor impairment that prevented him from picking up change off the table, the ALJ acknowledged Claimant wore wrist splints and there was mild swelling of the hands but no cyanosis of the fingers. (Tr. at 28.) The ALJ specifically found no medical records provided any consistent treatment for the numbness and pain in Claimant's hands or establish disabling upper extremity limitations. (Tr. at 29.) There was no evidence that documented objective findings or treatment for Claimant's alleged rheumatoid arthritis. (Id.) Throughout his discussion of the objective medical evidence of record, the opinion evidence, and Claimant's own allegations, the ALJ made numerous citations in the record from which he found "[t]reatment notes in the record do not sustain the claimant's allegations of disabling limitations." (Tr. at 30.) The ALJ further found that "[t]he credibility of the claimant's allegations is weakened by inconsistencies between the extent of his allegations and the objective medical evidence." (Id.) These were summarized briefly:

The claimant's reported activities in treatment records indicated greater activities than he described, such as loading scrap metal, working in the yard, and doing odd jobs. The claimant has some mental limitations, though he received no treatment for more than a 2-year period subsequent to his alleged onset date, but the medical evidence of record, including the opinion of an impartial medical expert, does not support disabling mental limitations.

(Tr. at 29.)

In short, the ALJ more than adequately discussed his reasons for finding Claimant less than credible, as the instances of the inconsistent statements in the treatment records were cited throughout the ALJ's discussion of the relevant evidence. The ALJ's discussion also complied with the factors required to be considered under the Regulations. Accordingly, the undersigned finds that Claimant's argument that the ALJ improperly assessed his credibility lacks merit.

Jobs Identified as a Result of the RFC:

Claimant's final argument concerns the jobs identified that he was capable of performing by the vocational experts were based on the ALJ's flawed RFC; this was highlighted when VE John Newman testified that if the reaching function, other than overhead, was reduced to "occasionally" instead of "frequently", then the occupational based would be significantly reduced, leaving jobs inconsistent with the RFC. (Document No. 14 at 20.)

Based on the ALJ's hypothetical questions number one and six, the VE identified the following unskilled, light jobs: assembler; packer; and inspector/tester/sorter. (Tr. at 31-32.) The first hypothetical was discussed briefly *supra*[23], however, to best address the appeal on this issue, it becomes imperative to reproduce the ALJ's first hypothetical in its entirety as posed to VE Newman:

I want you to assume we have a 39-year-old individual with a GED and the vocational profile that he's discussed and you've summarized. I want you to assume

---

[23] See page 22 of this Proposed Findings and Recommendation.

43

that he can do a full range of light work, . . . I'm looking at 8A, which is the Disability Determination issue. Obviously, once we get an ME interrogatory back, we'll have a better idea as to how much he may be able to do, but I want you to assume that he can lift and carry 10 pounds at least one-third of the day, he can stand for six hours, he can sit for six hours, that he has some manipulative limitations. They are primarily with his left arm and hand. No lifting overhead, or very little lifting overhead. As far as handling, fingering, and feeling, unlimited. I also want you to assume that because of his emphysema/COPD, he should avoid fumes, odors, dusts, gases, et cetera, when they are beyond what would be normally found in an . . . office type setting. I don't mean complete avoidance, but like where we're sitting today and he's sitting, someplace where there would be little smoke, odors, dusts, gases, things like that. And I also want you to assume, from an emotional standpoint, that he can do . . . only unskilled work. So, we're looking at light unskilled work with some above-head work preclusions and some environmental preclusions. Are there any jobs an individual so defined could perform?

(Tr. at 72.)

In response, VE Newman testified that the occupational base framed by the ALJ includes production-oriented unskilled work at the light exertional level. (Id.) VE Newman identified three categories of such jobs: assemblers, packers[24], and inspectors/testers/sorters, which he described as "three of many" such available jobs. (Tr. at 72-73.)

VE Newman further described that these jobs had "frequent" reaching requirements, which he stated the Department of Labor and the Dictionary of Occupational Titles ("DOT") define as "extending hands and arms in any direction." (Tr. at 75.) However, VE Newman explained that based on the ALJ's limitation to avoid overhead reaching, which is not recognized by the DOT definition of "reaching", VE Newman identified production-oriented jobs which typically do not require overhead reaching. (Id.) In response to questioning from Claimant's representative, VE Newman testified that if the hypothetical individual was further limited from "any[25] reaching on a

---

[24] In response to questions from Claimant's representative, VE Newman explained that laundry folder is under the "umbrella" category for packer. (Tr. at 74.)
[25] This included overhead reaching. (Tr. at 75.)

sustained basis" that would preclude him from performing the jobs he identified, however, "that would not abolish the entire occupational base, but it would severely reduce that occupational base." (Tr. at 75-76.) VE Newman identified "in-person service occupations" that required only occasional reaching: counter clerk/ushers/lobby attendants. (Tr. at 76.) VE Newman stated that the "hallmark" of all production-oriented work is "at least" occasional reaching, and "some at the constant level." (Id.)

At the supplemental hearing, the ALJ provided a sixth hypothetical question to VE Gerald K. Wells:[26]

> For this hypothetical, I also want you to assume that the individual . . . is 40 years old, has a GED . . . could occasionally lift and carry up to 50 pounds; that he could sit two hours at a time, stand two hours at a time, walk two hours at a time. In an eight-hour day, could stand/sit/walk six and sit six. He did not need a cane. As far as manipulation, or use of the hands, he could reach overhead, and push, and pull only occasionally, but could frequently reach in all other directions, and/or handling/fingering/feeling. I want you to assume – he could use the feet in foot and hand controls; that, from a postural standpoint, he could frequently climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; only occasionally, ladders. There were a couple of environmental restrictions, which I'll have you look at at your leisure, and assume they're all accurate. From a mental standpoint . . . is [not able to understand and remember detailed instructions].[27] He retains the capacity to sustain simple work at an acceptable (INAUDIBLE). Depressive symptoms would preclude complex work. Repeated hallucinations . . . are infrequent . . . and would not interfere with task persistence, and no suicidal ideation. He's able to interact appropriately with others. He's able to cope with a normal workday in a low-stress environment (INAUDIBLE)[.]

(Tr. at 44-45.)

---

[26] Though he did not testify at the first hearing, VE Wells was familiar with Claimant's vocational profile as well as VE Newman's testimony. (Tr. at 44.) VE Wells had also reviewed the interrogatory responses submitted by Dr. Scott and Dr. Adamo since the first hearing, which provided the additional restrictions or limitations in the ALJ's sixth hypothetical. (Tr. at 43-44.)

[27] Originally, the hypothetical contained the "mistype" identified by Claimant's counsel in Dr. Adamo's interrogatory response: "Claimant is able to understand and remember detailed instructions." (Tr. at 45.) The ALJ made the modification afterwards based on this obvious error. (Id.)

VE Wells testified that due to the restrictions on overhead work, he would limit Claimant to a light job, and with Dr. Adamo's restrictions, VE Wells stated that the work would need to be simple, light in exertion, and unskilled. (Tr. at 46.) The resulting jobs identified by VE Wells were assembler, packer, and inspector; VE Wells agreed with VE Newman's assessment. (Id.) If the hypothetical individual was restricted to occasional reaching in all directions, VE Wells testified that none of the three jobs identified would remain. (Tr. at 47.) With limitations to occasional handling, fingering, and feeling, VE Wells stated that such unskilled light jobs "are rare" and testified that a cafeteria cashier would be included in such a category. (Tr. at 47-48.) However, given Claimant's allegation that he "really can't pick up change", VE Wells testified that "no jobs" would then be available. (Tr. at 48.)

The ALJ determined that hypothetical questions numbers one and six established Claimant's RFC, and expressly rejected other hypothetical limitations because they were not based on the substantial evidence. (Tr. at 32.) Though the RFC was limited to a light range of work as defined by 20 C.F.R. §§ 404.1567(b), 416.927(b), it included Dr. Scott's findings that he provided in response to the ALJ's interrogatories (i.e., "can occasionally lift and carry up to 50 pounds; can occasionally reach overhead and push/pull with the upper extremities, but frequently reach in all other directions, handle, finger, and feel." (Tr. at 771.)) and incorporated Dr. Adamo's conclusions as well. (Tr. at 24.) The categories of jobs listed by both vocational experts were identical, and both vocational experts acknowledged the overhead reaching restriction in their identification of the three jobs categories. Though the ALJ's RFC provides that Claimant "can occasionally reach overhead and push/pull with the upper extremities, but frequently reach in all other directions, handle, finger, and feel" these were Dr. Scott's conclusions even though he also noted Claimant

had "limitation of use of arms above shoulder level especially [left]" (Tr. at 765.) and "difficulty working above shoulder level". (Tr. at 774.)[28] From the aforementioned, the ALJ's RFC is based upon substantial evidence as it was furnished from hypothetical questions, notably numbers one and six, that fairly set out all of Claimant's impairments, accordingly, the responses to those questions from the vocational experts who were called to testify in this matter were based upon substantial evidence. See, e.g., Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). The undersigned finds that Claimant's argument on this point lacks merit.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's Motion for Judgment on the Pleadings (Document No. 13.) **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 15.), and **AFFIRM** the final decision of the Commissioner.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is

---

[28] The undersigned notes that Dr. Scott opined that Claimant had equal limitations in both right and left hands: specifically, that Claimant can reach overhead occasionally bilaterally, reach in all other directions frequently bilaterally, handling/fingering/feeling frequently bilaterally, and push/pull occasionally bilaterally. (Tr. at 771.)

made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk of this court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: January 6, 2017.

Omar J. Aboulhosn
United States Magistrate Judge